CASE NO. 19-7497

# IN THE
# United States Court of Appeals
## FOR THE FOURTH CIRCUIT

DAVID NIGHTHORSE FIREWALKER-FIELDS,

*Plaintiff - Appellant,*

v.

JACK LEE, Superintendent;
MIDDLE RIVER JAIL AUTHORITY,

*Defendants - Appellees,*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
AT ROANOKE

**SUPPLEMENTAL BRIEF OF APPELLANT**

J. Scott Ballenger
Appellate Litigation Clinic
UNIVERSITY OF VIRGINIA
SCHOOL OF LAW
580 Massie Road
Charlottesville, VA 22903
202-701-4925
sballenger@law.virginia.edu

*Counsel for Appellant*

LANTAGNE LEGAL PRINTING
801 East Main Street Suite 100 Richmond, Virginia  23219 (804) 644-0477

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ................................................................................... ii

INTRODUCTION .....................................................................................................1

    I.    *KENNEDY* CONFIRMS THAT THE ESTABLISHMENT CLAUSE FORBIDS PRACTICES THAT EFFECTIVELY COERCE PARTICIPATION IN RELIGIOUS SERVICES, AND THAT PREFER ONE FAITH OVER OTHERS ........................................2

    II.    *KENNEDY* FURTHER SUPPORTS A CONCLUSION THAT MR. FIREWALKER-FIELDS HAS A TRIABLE ESTABLISHMENT CLAUSE CLAIM ................................................................................9

    III.    *KENNEDY* ALSO MAKES CLEAR THAT MRRJ HAS NO ESTABLISHMENT CLAUSE JUSTIFICATION FOR REFUSING TO PURSUE EASY AND OBVIOUS ALTERNATIVES TO ACCOMMODATE MR. FIREWALKER-FIELDS ................................10

CONCLUSION ........................................................................................................13

# TABLE OF AUTHORITIES

## Cases

*Cutter v. Wilkinson*,
    544 U.S. 709 (2005) ............................................................................. 1, 2, 7

*Kennedy v. Bremerton School District*,
    142 S. Ct. 2407 (2022) ........................................................................ *passim*

*Larson v. Valente*,
    456 U.S. 228 (1982) ...................................................................................... 7

*Lee v. Weisman*,
    505 U.S. 577 (1992) ...................................................................................... 3

*Lemon v. Kurtzman*,
    403 U.S. 602 (1971) ............................................................................. 2, 7, 12

*Marsh v. Chambers*,
    463 U.S. 783 (1983) .................................................................................... 13

*Santa Fe Independent School Dist. v. Doe*,
    530 U.S. 290 (2000) ................................................................................ 9, 10

*Shurtleff* v. *City of Boston, Massachusetts*,
    142 S. Ct. 1583 (2022) ........................................................................3, 4, 11

*Town of Greece v. Galloway*,
    572 U.S. 565 (2014) .................................................................................... 13

*Turner v. Safley*,
    482 U.S. 78 (1987) ........................................................................................ 1

## Other Authorities

Harry Elmer Barnes, *The Historical Origin of the Prison System in America*,
    12 J. Crim. L. & Criminology 35, 3 & n.3 (1921) ............................................ 6

Cooley, *A Treatise On The Constitutional Limitations Which Rest Upon The
    Legislative Power Of The States Of The American Union* (1st ed. 1868).................5

Kurt T. Lash, *The Second Adoption of the Establishment Clause:
The Rise of the Non-Establishment Principle*,
   27 Ariz. St. L.J. 1085 (1995) ............................................................................ 5

Michael McConnell, *Coercion: The Lost Element of Establishment*,
   27 Wm. & Mary L. Rev. 933 (1987) ................................................................. 4

Michael McConnell, *Establishment and Disestablishment at the
Founding, Part I: Establishment of Religion*,
   44 Wm. & Mary L. Rev. 2105 (2003) ................................................... 3, 4-5, 12

Skotnicki, *Religion and the Development of the American Penal System*
   (University Press of America 2000) ............................................................. 6, 13

# INTRODUCTION

The Supreme Court's recent decision in *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022), confirms that the district court erred in analyzing the Establishment Clause issues in this case under a policy-focused balancing test derived from *Turner v. Safley*, 482 U.S. 78 (1987). It is now clear that "the Establishment Clause must be interpreted by 'reference to historical practices and understandings,'" and that it forbids the "foremost hallmarks of religious establishments the framers sought to prohibit when they adopted the First Amendment." *Kennedy*, 142 S. Ct. at 2428-2429 (citations omitted). Those "foremost hallmarks" included coercive attendance at religious exercises, and preferential treatment for any one denomination over other faiths. *Id.*

The historical scholarship and caselaw evaluated by the Court in *Kennedy* reveal not only that coercive attendance at formal religious exercises was a traditional "hallmark" of religious establishment, but that such coercion within a characteristically government-dominated environment such as a jail is exactly the sort of practice that the Establishment Clause, as applied to the States through the Fourteenth Amendment, *dis*-establishes. The Court's history-centric approach in *Kennedy* also is completely consistent with the three principles the Court articulated in its unanimous opinion in *Cutter v. Wilkinson*, 544 U.S. 709 (2005), to govern Establishment Clause challenges to religious accommodations in prison specifically.

1

According to *Cutter*, such accommodations will be consistent with the Establishment Clause when they (1) remove government-created burdens on private religious exercise, (2) appropriately take into account burdens that accommodations impose on non-beneficiaries, and (3) are administered neutrally among different faiths. *Cutter*, 544 U.S. at 724. For reasons already briefed, Mr. Firewalker-Fields has a triable claim under those principles. *Kennedy*, and the relevant history of coerced attendance at religious worship, only reinforce that claim.

Finally, *Kennedy* confirms that no Establishment Clause concerns justified MRRJ's refusal to make recorded Jumuah services available to Mr. Firewalker-Fields. Downloading readily available Jumuah prayers from the internet would have implicated none of the historical "hallmarks" of a religious establishment, and any concerns about "entanglement" and "endorsement" have been rejected along with the *Lemon* test.

I.    ***KENNEDY* CONFIRMS THAT THE ESTABLISHMENT CLAUSE FORBIDS PRACTICES THAT EFFECTIVELY COERCE PARTICIPATION IN RELIGIOUS SERVICES, AND THAT PREFER ONE FAITH OVER OTHERS**

*Kennedy* considered the Bremerton School District's concern that tolerating private religious expression by a football coach after games would violate the Establishment Clause by leading observers to infer the District's "endorsement" of his religious beliefs. The Supreme Court finally and conclusively rejected *Lemon v. Kurtzman*, 403 U.S. 602 (1971), and its progeny, which had attempted to articulate

2

a "grand unified theory" of the Establishment Clause "call[ing] for an examination of a law's purposes, effects, and potential for entanglement with religion" as well as "whether a 'reasonable observer' would consider the government's challenged action an 'endorsement' of religion." 142 S. Ct. at 2427 (cleaned up).

Instead, the Supreme Court held that a "historically sensitive understanding of the Establishment Clause" must be focused on the "foremost hallmarks" of a religious establishment as understood by the framers, including the principle that "[g]overnment 'may not coerce anyone to attend church'" or "force citizens to engage in 'a formal religious exercise.'" *Id.* at 2429 (citations omitted). The Court held that Mr. Kennedy's private prayers "did not come close" to the line of "impermissible government coercion," because he made clear that he was willing to pray alone, after the student athletes were otherwise occupied or even not present. *Id.* at 2429-30. The fact that "some people would have seen his religious exercise" or even heard it did not mean they were somehow coerced to participate. *Id.* at 2430.

The facts of *Kennedy* did not require the Court to explore any of the other "foremost hallmarks" of an impermissible establishment, beyond a concern with coercion. But the Court cited (at 2429 n. 5) Justice Scalia's dissenting opinion in *Lee v. Weisman*, 505 U.S. 577, 640-42 (1992), Justice Gorsuch's recent concurring opinion in *Shurtleff v. City of Boston, Massachusetts*, 142 S. Ct. 1583, 1608-1610 (2022), and Professor McConnell's explanation of the history, *see generally* Michael

3

McConnell, *Establishment and Disestablishment at the Founding, Part I: Establishment of Religion*, 44 Wm. & Mary L. Rev. 2105, 2144-46 (2003) ("McConnell"). Those sources identify six "traditional hallmarks" of an establishment of religion as understood by the Framers:

> First, the government exerted control over the doctrine and personnel of the established church. Second, the government mandated attendance in the established church and punished people for failing to participate. Third, the government punished dissenting churches and individuals for their religious exercise. Fourth, the government restricted political participation by dissenters. Fifth, the government provided financial support for the established church, often in a way that preferred the established denomination over other churches. And sixth, the government used the established church to carry out certain civil functions, often by giving the established church a monopoly over a specific function.

*Shurtleff*, 142 S. Ct. at 1609 (Gorsuch, J., concurring) (citing McConnell, *supra*, at 2131-2181). As Justice Gorsuch explained, "[m]ost of these hallmarks reflect forms of 'coerc[ion]' regarding 'religion or its exercise.'" *Id*. (citations omitted); *see also, generally*, Michael McConnell, *Coercion: The Lost Element of Establishment,* 27 Wm. & Mary L. Rev. 933, 939 (1987) (the Founding history is "much easier to understand if one sees religious coercion as the fundamental evil against which the clause is directed").

Of course, the original Establishment Clause was not intended to displace these practices at the state level but to maintain the status quo by prohibiting Congressional interference with state establishments. *See, e.g.,* McConnell, *supra*,

4

at 2109. A "historically sensitive" understanding of the Establishment Clause as now incorporated against the states via the Fourteenth Amendment should, therefore, also account for the motivations of the *dis*-establishment movement of the 19th century. *See generally* Kurt T. Lash, *The Second Adoption of the Establishment Clause: The Rise of the Non-Establishment Principle*, 27 Ariz. St. L.J. 1085, 1136 (1995). By the time of the Reconstruction amendments, popular understanding of the anti-establishment provisions of state and federal constitutions had become entangled, "obscuring the federalist origins of the Establishment Clause" with a new conception of non-establishment as a matter of "fundamental religious liberty." *Id*. at 1130, 1133. That fundamental liberty was understood to require a prohibition against any form of religious compulsion, such that Sunday closing laws were permissible only when they served secular purposes and did not compel religious observances, *id.* at 1105-1108, and "forced participation in public school religious exercises" was understood as an establishment problem, *id.* at 1134. But it also required equality and neutrality, such that "no government could legitimately prefer … one religion over another." *Id*. Thomas M. Cooley's 1868 treatise explained that "[t]here is not religious liberty where any one sect is favored by the State and given an advantage by law over other sects," because a distinction favorable to one sect is "religious persecution" of others. Cooley, *A Treatise On The Constitutional Limitations Which*

*Rest Upon The Legislative Power Of The States Of The American Union* (1st ed. 1868).

Prevailing attitudes about religious instruction in prison appear to have followed a similar evolution. During the colonial era most crimes were punished with capital or corporal punishment. Prisons and lengthy sentences of incarceration were rare. *See, e.g.,* Harry Elmer Barnes, *The Historical Origin of the Prison System in America*, 12 J. Crim. L. & Criminology 35, 36 (1921). Penitentiaries were an early 19th century innovation and the movement for their creation grew (as the name suggests) out of an evangelical Protestant emphasis on redemption and rehabilitation. "[S]olitary confinement with labor, silence, and religious instruction [were] the norm" in the early 19th century. Skotnicki, *Religion and the Development of the American Penal System* 36 (University Press of America 2000) (describing Pennsylvania system); *see also id* at 38 (in New York, "[a]ll prisoners were to attend Sunday services."); *id.* at 70 ("all were marched to the chapel for services."); *id.* at 88 (Sabbath school classes "were held after the mandatory attendance at Sabbath services."). But "religion, despite any early influence it might have had on the penal system, was virtually eliminated as a significant visible force shortly after the Civil War, if not before in the eyes of a few." *Id.* at 3 & n.3 (collecting sources).

That history is fully consistent with the Court's analysis in the only case that has actually considered the Establishment Clause implications of religious services

6

and other accommodations in prisons: *Cutter v. Wilkinson*. In rejecting a facial Establishment Clause challenge to RLUIPA, the *Cutter* Court emphasized that the religious accommodations mandated by that statute would be acceptable so long as they (1) effectively remove government-imposed obstacles to *private* religious exercise, (2) do not inappropriately burden non-beneficiaries, and (3) are administered neutrally among different faiths. *Cutter*, 544 U.S. at 724. The *Cutter* opinion was unanimous, joined by those Justices who were already committed to the original-meaning understanding of the Establishment Clause later adopted in *Kennedy*, and did not rely in any way on *Lemon* or *Turner*. *See id.* at 718 n. 6 (noting the *Lemon* test and stating that "We resolve this case on other grounds.").

The three principles *Cutter* articulated are, in substance, a guide to identifying the "hallmarks" of a historically impermissible establishment within the unique prison environment. The first recognizes the critical distinction—also central to the reason of *Kennedy*—between the government tolerating religious exercise by individual citizens and sponsoring religious services of its own. The second resonates with the historical concern about any form of coercion or punishment for dissenters. And the third reflects what the Court has called "[t]he clearest command of the Establishment Clause," historically, which is "that one religious denomination cannot be officially preferred over another." *Larson v. Valente*, 456 U.S. 228, 244 (1982). Indeed, *Kennedy* emphasizes that the Free Exercise and Establishment

7

Clauses must be harmonized as serving "'complementary' purposes," not understood as inconsistent or in tension with each other, *see* 142 S. Ct. at 2426 (citation omitted), and governmental neutrality between different faiths is the central overlap and animating purpose of both Clauses.

Nothing in *Kennedy* undermines *Cutter*. To the contrary, the Court's reasoning in *Kennedy* makes even more clear that the historically-grounded factors identified in *Cutter* should govern Establishment Clause claims in the prison context. *Kennedy* squarely holds (as both parties to this case agreed even prior to *Kennedy*, *see* Reply Br. at 15-16 n.4) that it would be inappropriate to apply any version of the *Lemon* test. The *Turner* test that the district court borrowed from Free Exercise jurisprudence shares many of *Lemon*'s defects, particularly when extended to the Establishment Clause context: it is not grounded in history and invites freewheeling and highly manipulable policy balancing by courts. Of course *Turner* remains the Free Exercise test for now, but *Kennedy* confirms that the district court erred by extending it, in a manner no federal court of appeals has ever endorsed, to the Establishment Clause context. *See, e.g.,* Opening Br. at 33-38; Reply Br. at 12-17. *Cutter* is directly on point, and states the appropriate standard. And to the extent that *Kennedy* supplements or further elucidates the considerations identified in *Cutter*, it only adds further support to Mr. Firewalker-Fields's claim as discussed below.

8

## II. *KENNEDY* FURTHER SUPPORTS A CONCLUSION THAT MR. FIREWALKER-FIELDS HAS A TRIABLE ESTABLISHMENT CLAUSE CLAIM

Mr. Firewalker-Fields has already explained at some length why the record evidence in this case supports a triable Establishment Clause claim under the *Cutter* standard. The Court's opinion in *Kennedy* further supports that conclusion.

*Kennedy* confirms, repeatedly, that the government "'may not coerce anyone to attend church.'" 142 S. Ct. at 2429 (citations omitted). And in explaining why the circumstances in *Kennedy* were not coercive the Court distinguished *Lee v. Weisman* on the ground that the school in that case had included a member of the clergy in an "'official school graduation ceremony'" and had "'in every practical sense compelled attendance and participation'" in that ceremony. *Id.* at 2431 (citations omitted). The Court also distinguished *Santa Fe Independent School Dist. v. Doe*, 530 U.S. 290 (2000), in which the school broadcast a prayer "'over the public address system' before each football game." *Id.* at 2431-32 (citations omitted). By contrast, the Court reasoned, "[t]he prayers for which Mr. Kennedy was disciplined were not publicly broadcast or recited to a captive audience." *Id.* at 2432.

MRRJ's practices challenged in this case are on the wrong side of the line drawn in *Kennedy*. MRRJ plays its Christian services on Sundays as a "public[] broadcast" over the equivalent of a "public address system" to a "captive audience" of all inmates in the day rooms. *Id.* at 2431-32. MRRJ is not simply tolerating

9

religious exercises voluntarily undertaken by individual inmates, in a manner analogous to the personal prayer considered in *Kennedy*. MRRJ is broadcasting Christian services *itself* to the closed circuit televisions in every day room, effectively "'coerc[ing] [all inmates] to attend church,'" *id*. at 2429 (citations omitted), unless they are willing to give up virtually the only remaining freedom permitted to them during that time period by retreating to their cells. While the recordings used in those broadcasts may have been donated by local Mennonites, MRRJ is doing the broadcasting and its own Inmate Handbook promises that "[c]hurch services will be broadcast over the television on each pod every Sunday at posted times." *See* Opening Br. at 44 (collecting citations).

### III. *KENNEDY* ALSO MAKES CLEAR THAT MRRJ HAS NO ESTABLISHMENT CLAUSE JUSTIFICATION FOR REFUSING TO PURSUE EASY AND OBVIOUS ALTERNATIVES TO ACCOMMODATE MR. FIREWALKER-FIELDS

Mr. Firewalker-Fields has argued that MRRJ could, at a minimum, have accommodated his request to participate in Friday Jumuah prayers by allowing him to view any of the recorded services that are freely available on the internet. At oral argument, the panel noted MRRJ's policy of only accepting religious materials donated by outside volunteers, and raised concerns that by selecting among publicly available recordings MRRJ might be risking a violation of the Establishment Clause under the *Lemon* test. *See* Oral Argument in No. 19-7497, at 5:20-11:30 (Dec. 7, 2021).

10

*Kennedy* makes clear that *Lemon* is not the law and has not been the law for quite some time. *See* 142 S. Ct. at 2427 ("this Court long ago abandoned *Lemon* and its endorsement test offshoot"). In particular, *Kennedy* holds that the Court had already "made plain" in previous cases that concerns about endorsement and the perceptions of hypothetical reasonable observers play no role in Establishment Clause analysis. *Id.* The Court's opinion makes clear that the Bremerton School District could not have reasonably relied on such concerns in firing Mr. Kennedy, under already-existing jurisprudence. *See, e.g., id.* at 2427-28, 2433 ("Mr. Kennedy is entitled to summary judgment on his First Amendment claims").

Even if the initial selection of a recorded Jumuah service from the internet might be thought to entail some measure of (likely random) choice by MRRJ, it would not threaten any of the "hallmarks" of a religious establishment as historically understood. *See id.* at 2429. As previously explained, the primary theme of those hallmarks is religious coercion. Offering Mr. Firewalker-Fields an opportunity to view a recorded service, or to choose among several possible recordings, need not coerce anyone. The hallmark most closely analogous to the panel's concern is that the government traditionally "exerted control over the doctrine and personnel of the established church." *Shurtleff*, 142 S. Ct. at 1609 (Gorsuch, J., concurring) (citation omitted). While modern doctrine has until recently been more concerned with government advancement of religion, during the colonial years leading up to the

11

founding it was government "control" over doctrine, liturgy, and personnel that better characterized the British establishment of religion in the colonies. *See, e.g.,* McConnell, *supra*, at 2131. That "control" hallmark would be implicated by state interference with religious organizations themselves, and to that limited extent might capture concerns previously viewed through the lens of *Lemon*'s entanglement prong. *See, e.g., Lemon*, 403 U.S. at 619 (noting that the Rhode Island law at issue would have required a "comprehensive, discriminating, and continuing state surveillance" of instruction in religious schools). But there is no way to recast MRRJ downloading and displaying prayers that a mosque has voluntarily placed on the internet as impermissible "control" of doctrine or religious exercise by that mosque—which, in all likelihood, would never know that MRRJ exists. And MRRJ certainly would not have been "controlling" Mr. Firewalker-Fields's own religious exercise just by offering him a potential alternative way to participate in Jumuah prayers. To the contrary, MRRJ would have been partially *alleviating* the otherwise pervasive control that it exercised over every aspect of his life, and that prevented him from practicing his faith in accordance with his own beliefs.

*Kennedy*'s "historically sensitive" approach to the Establishment Clause also requires us to compare MRRJ's concerns with historical practice. 142 S. Ct. at 2429. Downloading Jumuah prayers from the internet would involve less choice or discretion than hiring a particular prison chaplain from among multiple applicants.

12

Prison officials have been undertaking that function since the invention of the penitentiary,[1] and it is not meaningfully different from the selection of legislative chaplains—a task the First Congress endorsed only days after approving language for the First Amendment, and that Supreme Court precedent (the history-centered precedent cited favorably in *Kennedy*) clearly authorizes. *See Town of Greece v. Galloway*, 572 U.S. 565, 576-77 (2014); *Marsh v. Chambers*, 463 U.S. 783, 787-88 (1983).

## CONCLUSION

The Supreme Court's recent decision in *Kennedy* confirms that this case should be remanded for a trial.

Respectfully submitted on August 9, 2022,

/s/ J. Scott Ballenger
J. Scott Ballenger
APPELLATE LITIGATION CLINIC
University of Virginia School of Law
580 Massie Rd.,
Charlottesville, VA 22903
(434) 924-7582
sballenger@law.virginia.edu

*Counsel for Appellant*

---

[1] *See, e.g.,* Skotnicki, *supra*, at 83-89. The online library maintained by the National Criminal Justice Reference Service of the Office of Justice Programs in the United States Department of Justice contains numerous reports and articles about the history of prison chaplaincy. *See* https://www.ojp.gov/ncjrs/virtual-library

13