**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────

**No. 19-7497**

───────────

DAVID NIGHTHORSE FIREWALKER-FIELDS,

Plaintiff - Appellant,

v.

JACK LEE, Superintendent; MIDDLE RIVER JAIL AUTHORITY,

Defendants - Appellees.

───────────

Appeal from the United States District Court for the Western District of Virginia, at Roanoke. Norman K. Moon, Senior District Court Judge. (7:17-cv-00400-NKM-JCH)

───────────

Argued: December 7, 2021                    Decided: January 17, 2023

───────────

Before GREGORY, Chief Judge, RICHARDSON, Circuit Judge, and Rossie D. ALSTON, Jr., United States District Judge for the Eastern District of Virginia, sitting by designation.

───────────

Affirmed in part, vacated in part, and remanded by published opinion. Judge Richardson wrote the opinion, in which Chief Judge Gregory and Judge Alston joined.

───────────

**ARGUED:** Ignacio Martinez Castellanos, Hannah Comeau, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, for Appellant. Julian Friedman Harf, GUYNN WADDELL CARROLL & LOCKABY, P.C., Salem, Virginia, for Appellees. **ON BRIEF:** J. Scott Ballenger, Zev Klein, Third Year Law Student, Joshua Short, Third Year Law Student, Carly Wasserman, Third Year Law Student, Appellate Litigation Clinic, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville,

Virginia, for Appellant.  Emily K. Stubblefield, GUYNN WADDELL CARROLL & LOCKABY, P.C., Salem, Virginia, for Appellees.

RICHARDSON, Circuit Judge:

David Nighthorse Firewalker-Fields spent nearly three months in Middle River Regional Jail. And he alleges that Middle River's practices during that time substantially burdened his Islamic faith while unconstitutionally favoring the practice of the Christianity. He argues that he was kept from engaging in Friday Prayer, and all the while the jail broadcast non-denominational but distinctly Christian services every Sunday on televisions throughout the facility. This case deals with the difficulty of analyzing constitutional rights claims by prisoners, who necessarily surrender some rights during incarceration, and particularly the difficulty of dealing with religious accommodations in prison. Prisons are required to provide religious accommodations; the question here is when those accommodations go too far and when they do not go far enough.

Firewalker-Fields's claims regarding Friday Prayer implicate the Free Exercise Clause. Under that clause, prisons can impose burdens on inmates' religious practice—even substantial burdens—so long as the prison rules that do so are "reasonably related to legitimate penological interests." Middle River had three rules in place that kept Firewalker-Fields from attending in-person Friday Prayer: no inmate led groups; no maximum-security prisoners allowed in any in-person groups; and prisoner services and classes by volunteer or donation only. Those rules are reasonably related to justifiable prison goals and therefore do not offend the Free Exercise Clause.

Firewalker-Fields's claims about the Christian broadcasts implicate the Establishment Clause. What that clause requires has recently been unsettled. The Supreme Court in *Kennedy v. Bremerton School District* announced that the *Lemon* test—the Fourth

Circuit's long-used, all-purpose Establishment Clause test—is no longer good law, and that in its place, courts should use an analysis that focuses on history, tradition, and original meaning.

While we affirm the district court's Free Exercise decision, we must remand for further proceedings on the Establishment Clause to allow the district court to grapple with the history-and-tradition test in the first instance.

## I.     Background

### A.     Facts

This appeal involves the period that David Nighthorse Firewalker-Fields spent in Middle River Regional Jail before being transferred to long-term imprisonment in the Virginia Department of Corrections.

Firewalker-Fields arrived at Middle River on a Wednesday.  By the next day, before he had missed Friday Prayer or endured a Sunday service, he already filed an Inmate's Grievance:  "Why is [Middle River] promoting the Christian Religion while not allowing myself as a Sunni Muslim to be allowed to have access to Jumuah, the [F]riday prayer service?"  J.A. 11.  Firewalker-Fields asked for Friday Services to be put in place and to receive a § 1983 lawsuit package.  About two weeks later, Firewalker got his first response from the jail:  "The program over the TV is a non-denominational program that people can choose whether or not to watch.  You are allowed to have your religious material and believe as you choose."  J.A. 11.

Firewalker-Fields appealed that denial two days after receiving it, arguing that other prisons, like the Virginia Department of Corrections, allow inmates to serve as imams for

Friday Services with a guard present. But the Middle River Administration's response was the same: "Mr. Firewalker, you may practice your religion in your housing area. Sunday service is non-denominational." J.A. 12.

Having failed to gain anything in the grievance process, Firewalker-Fields put his § 1983 lawsuit package to use. Just over three weeks after being placed in the jail, Firewalker-Fields sued Middle River and Jack Lee, in his capacity as Superintendent. He alleged: "Middle River Regional Jail Authority and Jack Lee authorize Christian Faith Classes while not allowing or offering Islamic Faith Classes." J.A. 8. Firewalker-Fields asked for damages; he asked to be transferred from the jail to the Department of Corrections as soon as possible; and finally, he asked for an injunction requiring Middle River to institute Islamic services.

Two months later, Firewalker-Fields was transferred out of Middle River to permanent placement in the Virginia Department of Corrections system. But the § 1983 suit continued on. Ultimately, the district court granted summary judgment for Lee and Middle River. J.A. 74. Firewalker-Fields timely appealed, and we have jurisdiction. 12 U.S.C. § 1291.

### B.    Religious Accommodation at Middle River

While its population is predominantly Christian, Middle River houses inmates of many religions. In 2018, a year after Firewalker-Fields left, around 33 religions were represented at the jail. Inmates of every religion were provided some accommodations. All inmates were allowed to pray in their cells; to have some access to soft-cover religious texts; and to visit once per week with a spiritual advisor with whom they could talk and

pray. Muslims were given a few additional accommodations, including special mealtimes during Ramadan and a pork-free diet all year round.

In some respects, Christians had greater opportunity to practice their faith, but this was primarily due to Middle River's policy that all religious and non-religious classes were volunteer or donation only. The jail had volunteers and donations from Christian groups. So Middle River offered a volunteer-led, non-denominational "faith-based class" for all inmates, but which used "the Bible [as] the central text." J.A. 51. But they had never received Muslim volunteers or donations, so there was no faith class using the Quran as the central text.

Middle River also played a Christian video on Sundays. That video, donated by a local Mennonite Christian group, had Christian themes and used the Bible. The service was broadcast using a closed-circuit television system into every "day room" in the jail, communal spaces attached to the inmates' housing units. Middle River's closed-circuit TV system only allowed a single video to be played at a time and that video was played on all the available screens simultaneously.

Firewalker-Fields's frustrations with these policies are twofold. First, he argues that he could not avoid the Christian broadcasts. He claims that while the broadcasts played, he could either go out into the common room and listen to Christian proselytizing or stay in his housing unit. The prison largely agrees with that characterization: "Inmates that do not want to watch the services can stay in their housing areas." J.A. 48. Firewalker-Fields argues that the experience felt like an ultimatum: "Be Christian or be penalized." J.A. 68.

Beyond the Christian video, Firewalker-Fields was also upset by the lack of any Muslim services or classes. Specifically, Firewalker-Fields wanted to perform Jumuah—or Friday Prayer—"which [is] a required part of the Islamic faith." J.A. 9. The jail did not offer any Islamic services or classes. Again, this was due to the lack of any Muslim donations or volunteers. And Middle River claims it attempted to remedy the situation by reaching out to a nearby mosque for help, but those efforts failed.

Even apart from the lack of Muslim volunteers or donations, Middle River indicated that it could not have logistically accommodated Friday Prayer sessions. Every day from 11 am to 1:30 pm, the jail was on lockdown for lunch and midday count. That tied up all available officers in various tasks, and Middle River claims that this prevented the jail from properly supervising a Muslim service on Fridays at noon as requested. And the possibility of having to provide that kind of get-together for every faith was daunting.[1]

These logistical challenges would not be alleviated by permitting inmates to lead the prayer services. And, more to the point, Middle River policy did not allow inmate-led groups of any kind—religious or otherwise—because of security concerns about the effects of forming inmates into affinity groups. The jail was concerned about the "inherent safety

---

[1] Middle River officials also suggested in a declaration for this lawsuit—given a year after Firewalker-Fields left the jail—that "[e]ven if an imam volunteered to lead Muslim services or classes at [Middle River], it would not be in the best interests of the Jail to offer such programming at this time." J.A. 51. In 2018, there were six Muslims out of 905 inmates, which is about 0.6% of the prison population. And while a small session during lockdown for six inmates is one thing, the jail official suggested that they could not provide a service for every one of the 33 represented religions. The jail, they said, "does not have enough space, staff, or willing volunteers to support services and classes for every approved faith group." J.A. 52.

7

risks" of fostering group behavior and "gang mentality." J.A. 50 (cleaned up). In any event, Firewalker-Fields would never have been able to attend any in-person classes during his time at Middle River because he was classified as a maximum-security inmate due to his criminal history and background, and maximum-security inmates were not allowed to attend in-person classes.

It was possible for a maximum-security prisoner like Firewalker-Fields to invite an imam to pray with him during the Friday afternoon "Professional Visiting" time, starting at 12:30 pm. That would have allowed him to engage in Friday Prayer, if not exactly at noon. But Firewalker-Fields never put an imam on his visitation list and provided no evidence that he reached out to an imam.

## II.    Discussion

Only two of Firewalker-Fields's original claims remain on appeal, and they are based on the first two clauses of the Bill of Rights. He argues that Middle River's policies violate the Free Exercise Clause and the Establishment Clause.

Before proceeding to those claims, a word about what is not at issue here. One of the initial claims that Firewalker-Fields brought was under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 114 Stat. 803, 42 U.S.C. § 2000cc *et seq.* But that Act only provides equitable relief to prisoners. *See Wall v. Wade*, 741 F.3d 492, 496 n.5 (4th Cir. 2014). Because Firewalker-Fields was transferred out of Middle River to long-term imprisonment in the Virginia Department of Corrections, any injunctive relief and therefore any claim under RLUIPA is moot. *See Rendelman v. Rouse*, 569 F.3d 182, 186–87 (4th Cir. 2009); *see also Mo., Kan. & Tex. Ry. v. Ferris*, 179 U.S. 602, 606

(1900) ("Moot questions require no answer.").  The district court therefore properly dismissed the RLUIPA claims against Middle River, and they are not before us.  This detail is important to bear in mind, because while RLUIPA requires a form of strict scrutiny in the prison context, 42 U.S.C. § 2000cc-1(a), the First Amendment provides less robust protection, *see Turner v. Safley*, 482 U.S. 78, 89 (1987).

With that caveat in mind, we take the two remaining constitutional claims in turn.

### A.     Free Exercise

#### 1.     Legal Standards

"Congress shall make no law . . . prohibiting the free exercise [of religion]."  U.S. Const. amend. I.  To make a Free Exercise claim, a prisoner must first show, as a threshold matter, that a prison practice or regulation violates his Free Exercise rights before showing that the prison's policies are not "reasonably related to legitimate penological interests." *Ali v. Dixon*, 912 F.2d 86, 89 (4th Cir. 1990) (citing *Turner*, 482 U.S. at 89).

Under Fourth Circuit precedent, the threshold showing is two-pronged:  A prisoner must show (1) that he holds a sincere religious belief and (2) that his religious practice has been substantially burdened by the prison policy or practice.  *Greenhill v. Clarke*, 944 F.3d 243, 253 (4th Cir. 2019).  A substantial burden either puts pressure on a person to change his religious beliefs or puts that person to a choice between abandoning his religion or

following his beliefs and losing some government benefit. *Lovelace v. Lee*, 472 F.3d 174, 187 (4th Cir. 2006).[2]

If that threshold showing is made, the prisoner must then show that the practice or regulation is not "reasonably related to legitimate penological interests." *Turner*, 482 U.S. at 89. We look to a four-factor test to determine the reasonableness of a prison regulation:

> (1) whether there is a valid, rational connection between the prison regulation and the legitimate governmental interest put forward to justify it;
> (2) whether there are alternative means of exercising the right that remain open to prison inmates;
> (3) the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and
> (4) whether there are ready alternatives.

*Greenhill*, 944 F.3d at 253 (cleaned up) (quoting *Turner*, 482 U.S. at 89–91). Applying these factors also requires that we give substantial deference to prison officials, especially

---

[2] The Fourth Circuit's gloss on this threshold showing appears to be out-of-date. The "substantial burden" language this Court uses calls back to an older Free Exercise test that was overruled 30 years ago. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682, 694 (2014) (recounting the Court's rejection of the substantial-burden balancing test in 1990). Under more recent Free Exercise doctrine, the Supreme Court has made clear that neutral laws of general application which only incidentally burden religion are not constitutionally suspect. *See Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1876 (2021).

Yet our Circuit still applies a "substantial burden" threshold test, and while that may have made sense for a few years in the 1980s, it no longer does. *Turner*—the case we're about to describe having set the rule for constitutional rights in prison—came down in 1987 when the old Free Exercise "substantial burden" test was still in force. The neutral-and-generally-applicable test was created in 1990 by *Employment Division v. Smith*, 494 U.S. 872, 879 (1990). So when courts first started applying *Turner* in the Free Exercise context, they rightly would have used the "substantial burden" standard as a threshold test in these cases—at least for a few years—but it is unclear why we should still be doing so. *See Carter v. Fleming*, 879 F.3d 132, 139 (4th Cir. 2018) (citing pre-*Smith* precedent for the threshold showing in a prisoner Free Exercise case).

*Turner* does not set in amber the state of constitutional law in 1987. Instead, it only applies "when a prison regulation impinges on inmates' constitutional rights." *O'Lone v.* (Continued)

when it comes to the third factor, the impact on guards, inmates, and resource allocation. *Overton v. Bazzetta*, 539 U.S. 126, 135 (2003). "The difficulties of operating a detention center must not be underestimated by the courts." *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, 566 U.S. 318, 326 (2012). Especially when dealing with jails, which generally have greater churn than prisons, officials "must have substantial discretion to devise reasonable solutions to the problems they face." *Id.* "The burden is not on the State to prove the validity of prison regulations but on the prisoner to disprove it." *Jehovah v. Clarke*, 798 F.3d 169, 176 (4th Cir. 2015) (cleaned up) (quoting *Overton*, 539 U.S. at 132).

## 2.    Analysis

We begin by assuming that Firewalker-Fields has made the threshold showing of a Free Exercise violation: that he held a sincere religious belief[3] and that Middle River

---

*Estate of Shabazz*, 482 U.S. 342, 349 (1987) (citing *Turner*, 482 U.S. at 89); *see Ali*, 912 F.2d at 89 ("Before proceeding to the *Turner* analysis, we must first determine whether the prison policy impinges on Ali's free exercise rights."). So courts should consider whether there is a first-order rights violation using the current constitutional standards, and then apply the penological-interest test *Turner* directs that we consider in the prison setting.

A more accurate application of the Supreme Court precedents in this area would look to whether the prison policy or regulation was "neutral and generally applicable." *Fulton*, 141 S. Ct. at 1876. When a policy or practice failed at that hurdle, then we would replace the traditional strict scrutiny test with the *Turner* analysis. *See Ali*, 912 F.2d at 89–91 ("Because the prison policy impinges on Ali's free exercise rights, it may be upheld only if it meets the *Turner* standard.").

Because we affirm the denial of Firewalker-Fields's Free Exercise claim, the threshold standard will not matter in this case. And perhaps even beyond this case, it will be rare for a prisoner to carry his burden under *Turner* without showing a substantial burden on his religious practice.

[3] Middle River argued below that there was strong evidence that Firewalker-Fields did not hold a sincere religious belief. For instance, Firewalker-Fields also asked jail staff for the address of a Catholic church, some rosary beads, a Catholic bible, and the Catechism (Continued)

imposed a substantial burden on his religious practice.  Even assuming he has met this threshold showing, Firewalker-Fields cannot prevail on his Free Exercise claim because he cannot make out his burden to prove that the prison's policies were unreasonable under *Turner*.

Applying the *Turner* test requires us to identify the prison rules that led to Firewalker-Fields's inability to attend Friday Prayer services during his time at Middle River.  As best we can tell, three rules are relevant.  First, the prison did not allow inmate-led groups of any kind, secular or religious.  Second, all classes and services at Middle River—religious or secular—were volunteer or donation only.  And third, maximum-security inmates were not allowed to attend any classes at the jail.  So with no Muslim volunteers or donations, no ability for any inmate to run a prayer service, and no possibility of attending any Muslim class as a maximum-security inmate, Firewalker-Fields could not attend any in-person Friday Prayer service while at the jail.

We take each factor in turn.

*Factor One:  Rational connection to a legitimate government interest.*  First, a prison regulation must have a "valid, rational connection" to the legitimate government interest that is put forward to justify it.  *Turner*, 482 U.S. at 89.  This first factor places a burden on the prison to put forward the actual interests that support their policies.  *See*

---

of the Catholic Church.  And he asked for the address of the Church of Jesus Christ of Latter-Day Saints and of the Fundamentalist Church of Jesus Christ of Latter-Day Saints. Because we ultimately side with Middle River, we need not determine whether Firewalker-Fields held a sincere religious belief.  But we note that, even with evidence against him, Firewalker-Fields's claim that he was a true believer is likely enough to show a genuine dispute of that material fact.

*Lovelace,* 472 F.3d at 200–01 n.9; *Ali*, 912 F.2d at 90 (striking down a policy under *Turner* because prison officials failed to put forward any penological interests).

Middle River has put forth two justifications for its policies: security and resource-efficiency. The jail relies mainly on security concerns to defend its rule barring inmate-led groups. The jail suggests that there are inherent dangers in letting prisoners form affinity groups, based on concerns about aggressive group behavior. Prisoner and officer safety are legitimate concerns, *see Jehovah*, 798 F.3d at 178, and the Supreme Court has credited an argument just like this one: "You wind up with a leadership role and an organizational structure that will almost invariably challenge the institutional authority." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 353 (1987) (cleaned up).

As to Middle River's participation ban on maximum-security inmates, maximum-security status is determined at the jail by looking at criminal history and other risk factors like gang affiliation, history of suicide attempts, and prior drug and alcohol use. The jail uses objective factors to determine which prisoners are too dangerous to be allowed to mingle with others during their temporary stay at Middle River. That system is undeniably related to concerns about security.

Firewalker-Fields argues that prisons might achieve better security outcomes by being more accommodating of religious practice. It might be true that prisons would be safer if religious accommodations were granted more freely. Maybe such a policy would create a happier, more compliant prison population. But in applying these factors, we are meant to be deferential to the prison's rationale. We look to see if the policies reasonably relate to some legitimate goal, not whether we would make the policy choices differently.

The rules against inmate-led groups and keeping maximum-security prisoners out of group classes reasonably relate to the concern for security.

To defend its policy requiring all activities to be done by volunteer or donation only, the jail relies on resource-allocation concerns. Jails like Middle River have a legitimate interest in the efficient use of resources, and requiring all classes and services for inmates to be done by volunteer or donation—in other words, for free—reasonably relates to that legitimate goal.

*Factor Two: Alternative means of exercise open to the prisoner.* Next, courts should consider whether "there are alternative means of exercising the right that remain open to prison inmates." *Turner*, 482 U.S. at 90. If a prisoner shows that there is no other way to exercise the right at all, even that "would not be conclusive," but "it would be some evidence that the regulations were unreasonable." *Overton*, 539 U.S. at 135.

The level of generality matters. "The pertinent question is not whether the inmates have been denied specific religious accommodations, but whether, more broadly, the prison affords the inmates opportunities to exercise their faith." *Baranowski v. Hart*, 486 F.3d 112, 121 (5th Cir. 2007) (cleaned up); *see also O'Lone*, 482 U.S. at 352 (considering "whether the inmates were deprived of 'all means of expression'"). So this is not about whether Firewalker-Fields had the opportunity to engage in Friday Prayer on his terms, but rather whether he could generally engage in worship.

*O'Lone* is a helpful comparison. That case also dealt with Friday Prayer; some Muslim prisoners were assigned to work detail during Friday afternoons and, therefore, could not stop for prayer as their religion required. *O'Lone*, 482 U.S. at 346–47. When

14

considering this factor, the Court did not look to see whether a prisoner had other ways to perform Friday Prayer at noon as they pleased but to all the ways the Muslim prisoners could generally engage in their religious practice. The Supreme Court found that state-provided imams, communal prayer time, pork-free meals, and Ramadan-specific eating times were relevant to showing that regulations keeping prisoners from Friday Prayer were reasonable. *Id.* at 352. "We think this ability . . . to participate in other religious observances of their faith supports the conclusion that the restrictions at issue here were reasonable." *Id.*

This case involves similar accommodations. Firewalker-Fields could keep a prayer rug and a Quran; he could keep a diet consistent with Islamic practice; he could request Ramadan-specific eating hours; he could pray Friday Prayer by himself in his housing area; and he could invite an imam to visit him during lockdown on Fridays to engage in prayer—even if it were at 12:30 and not noon. *O'Lone* involved more opportunities than were present here, including state-provided imams and time to "congregate for prayer and discussion." *See id.* But there is little surprise that a permanent prison would have more accommodation than a short-term jail. *See Florence*, 566 U.S. at 326. *O'Lone* shows that reasonable alternative accommodation of religious practice supports finding a prison regulation reasonable. And here, alternative means of expression were indeed open.

*Factor Three: Impact of accommodation on guards, inmates, and resource allocation.* The next consideration is "the impact accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison

15

resources generally." *Turner*, 482 U.S. at 90. Where there will be a "significant 'ripple effect'" from a potential accommodation, "courts should be particularly deferential." *Id.*

First, consider the ban on inmate-led groups. The ripple effect on prison operations from mail correspondence between prisoners led the Supreme Court in *Turner* to uphold a ban: "[C]orrespondence between [prisoners] facilitates the development of informal organizations that threaten the core functions of prison administration, maintaining safety and internal security [and such] organizational activities . . . can be exercised only at the cost of significantly less liberty for everyone else, guards and other prisoners alike." 482 U.S. at 92. The same argument about downstream consequences is used here by Middle River to justify its ban on inmate-led groups. *See Jones v. N.C. Prisoners' Lab. Union*, 433 U.S. 119, 129 (1977) ("It is clearly not irrational to conclude that . . . concerted group activity, or solicitation therefor, would pose additional and unwarranted problems and frictions in the operation of the State's penal institutions."). And this rationale likewise supports barring maximum-security prisoners from prison groups and services. Allowing the most dangerous prisoners to gather poses potentially severe security risks for guards and other prisoners alike.

As to the volunteer-and-donation rule, the Supreme Court has held that it is legitimate to worry about potential "drain on scarce . . . resources." *See O'Lone*, 482 U.S. at 353. Guards, inmates, and administrators alike are affected by the proper allocation of a jail's limited resources. Requiring the jail to take affirmative steps to find a religious leader or a recorded prayer service for every religion represented in the prison population would likely cause resource issues for the budgets of jails and prisons while injecting State

16

prison personnel in the selection of appropriate prayers or religious leaders.  With due deference in mind, Middle River's concern for the effects of accommodation is reasonable.

*Factor Four:  Whether ready alternatives to the policy exist.*  Finally, courts should consider possible alternative policies.  *Turner*, 482 U.S. at 90.  Where there is an "absence of ready alternatives," that favors finding the policy reasonable.  *Id.*  Where there are "obvious, easy alternatives" available, that may suggest a policy is unreasonable.  *Id.*  This is not a least-restrictive-alternative test; it looks for easy and obvious alternatives that do not "impos[e] more than a de minimis cost to the valid penological goal."  *Overton*, 539 U.S. at 136.  And it is Firewalker-Fields's burden to suggest those reasonable alternatives, not Middle River's burden to imagine them.  *See Lane v. Griffin,* 834 F.2d 403, 407 n.5 (4th Cir. 1987) ("It is improper to place the burden on a prison official to show that no reasonable method exists by which religious rights can be accommodated without creating bona fide security problems.").  So Firewalker-Fields bears the burden to ask for what he needs.

This is one point in our analysis where the gap between the constitutional standards under *Turner* and the statutory standards under RLUIPA is widest.  Under the Free Exercise Clause, a prisoner bears a not insignificant burden to bring forward easy alternatives to the policy that burdens their religious practice.  But in the RLUIPA context, when a prisoner is asking for an injunction to change burdensome policies, the prison bears the burden to justify its practices under the unforgiving strict-scrutiny standard.  *See* 42 U.S.C. § 2000cc-1(a).

Comparing this case to the Supreme Court's most recent RLUIPA death-penalty case—*Ramirez v. Collier*, 142 S. Ct. 1264 (2022)—illustrates this stark difference. In *Ramirez*, Texas tried to enforce a no-touch policy for its planned execution of Ramirez, but Ramirez argued that it was part of his faith to have his pastor "lay hands on me anytime I am sick or dying." *Id.* at 1274. Texas argued that allowing an untrained, lay person to touch a prisoner as he went through the lethal injection procedure might lead to accidents and "preventable suffering." *Id.* at 1281. The Court held that there were at least a handful of less-restrictive alternatives—"touching on a part of the body away from IV lines," arranging the pastor to be out of the sight lines of the medical team, restricting the time that the pastor could touch the prisoner, or even putting the pastor though some medical training. *Id.* Texas tried to argue that it was not their burden to come up with creative solutions but Ramirez's burden to offer them—just like we have said here—but the Court disagreed: "That gets things backward. Once a plaintiff has made out his initial case under RLUIPA, it is the government that must show its policy 'is the least restrictive means of furthering [a] compelling governmental interest.'" *Id.* (quoting 42 U.S.C. § 2000cc-1(a)(2)). But Firewalker-Fields's injunctive relief claims under RLUIPA are moot, so he has only a damages claim under the First Amendment left, and that makes all the difference here.

In front of this Court, Firewalker-Fields offers a handful of alternative solutions: that inmates be allowed to lead prayer groups, that the prison should try harder to get a volunteer imam to provide services, that Friday Prayer might be broadcast to all the closed-

circuit televisions like Church services are on Sundays, and that a personal television or tablet might be provided to inmates during Friday Prayer.

Before testing these solutions, we need to consider if Firewalker-Fields waived these arguments by not raising them to the district court or to the prison. In his Complaint, Firewalker-Fields did not raise specific solutions; he simply asked for "Middle River to institute Islamic Prayer services on Fridays." J.A. 18. The only suggestion that Firewalker-Fields made to the prison or to the district court before this appeal was to allow an inmate to lead a Friday Prayer service with a staff member present. He points out that the Virginia Department of Corrections allows meetings of that kind, and that he would have been willing to serve as a leader himself. But that is no alternative because it does not alleviate the concern with inmate-led groups which we have already discussed. Until appellate counsel got involved, the district court was right to say that an obvious, easy alternative was "not readily apparent, and Firewalker-Fields [had] not suggested one." J.A. 68. Because he pitched none of these creative solutions to the prison at the time, he cannot use them after the fact to prove that the prison's rules were not reasonable.

But even if we looked past this pleading failure, none of the solutions offered in the appellate briefing are easy, obvious, and low-cost. Providing a Muslim Friday Prayer broadcast over the closed-circuit TV might be done if it were donated like the Christian broadcast. But without a donation, the process would require selecting the right video to serve the Muslim prison population. Once the prison began selecting videos rather than taking donations, it would need to select appropriate videos for every religion. Placing the

choice of appropriate prayers into the hands of the warden raises substantial administrative difficulty.

Providing Firewalker-Fields with an individual tablet or television for viewing Friday prayer might not have involved a huge expenditure of resources, but in the aggregate, scheduling a system for the whole prison to lend out tablets aligned with each prisoner's desired prayer time would no doubt add at least some administrative burden. And without donations, Middle River would still be left with a system requiring the warden to decide what religious programing to offer. As to trying to get volunteers or donations, that suggestion does not provide an "easy and obvious" solution. Middle River already tried that strategy, and it failed.

In the end, this fourth factor is about easy alternatives, not finding the least restrictive means. *Overton*, 539 U.S. at 136. "The Constitution does not mandate a lowest common denominator security standard, whereby a practice permitted at one penal institution must be permitted at all institutions." *Turner*, 482 U.S. at 95 n.* (cleaned up). Even if we look past the fact that Firewalker-Fields did not offer most of these alternatives during the 83 days when he was in the jail, none of these solutions are so easy and so obvious that they suggest Middle River's policies were not reasonably related to legitimate penological interests.

In summary, each of Middle River's policies is reasonably related to the legitimate penological purposes of security and resource-allocation; despite the jail's policies, Firewalker-Fields still had other ways to practice his religion, even if they were not perfect; Firewalker-Fields's preferred solutions would have impaired the jail's safety and its

20

efficient operation; and Firewalker-Fields failed to propose easy and obvious alternative policies that would have solved those issues while allowing more room for his religious practice. Taken together, this shows that each challenged policy is reasonably related to legitimate penological goals and are justifiable under *Turner*.[4]

Before concluding our Free Exercise analysis, there is a stray statement in the record that needs exploring and which might be read to undermine our reasoning. More than a year after Firewalker-Fields left Middle River, the jail's Program Director stated in a declaration for this litigation that "[e]ven if an imam volunteered to lead Muslim services or classes at [Middle River], it would not be in the best interests of the Jail to offer such programming at this time." J.A. 51. His concern was that providing such programming would be too much for Middle River to accommodate in the aggregate. At that time, the

---

[4] Even if we had found that some of these rules were not justifiable under *Turner*, Firewalker-Fields would have had at least one more significant hurdle to overcome before getting to a jury. There is a potential causation problem with Firewalker-Fields's claim that Middle River burdened his religious practice. Section 1983 incorporates common-law causation principles. *Wright v. Lassiter*, 921 F.3d 413, 419 (4th Cir. 2019) (citing *Evans v. Chalmers*, 703 F.3d 636, 647 (4th Cir. 2012)). And under those principles, a plaintiff's burden, for instance, cannot be "self-imposed." *Id.* at 419 (quoting *Andon, LLC v. City of Newport News*, 813 F.3d 510, 515 (4th Cir. 2016)). Further, the "subsequent acts of independent decision-makers" can sometimes "break the causal chain between a defendant['s] misconduct and a plaintiff's [claim]." *Evans*, 703 F.3d at 647. Other courts have held that "a lack of outside clergy, volunteer visitors, [or] practicing co-religionists" can sometimes break the casual chain between a prison regulation and a substantial burden on religious practice. *See, e.g.*, *Bader v. Wrenn*, 675 F.3d 95, 98–99 (1st Cir. 2012). For example, a prison cannot be said to have "imposed" a burden on a desire for a religious community when the intervening factual cause of the burden was that no other prisoners wanted to join in that community. *Wright*, 921 F.3d at 419. This case may well fit that mold, especially considering that Firewalker-Fields was barred from attending group events as a maximum-security inmate, that there is no evidence that other Muslim inmates would have joined Firewalker-Fields in prayer, and that no outside donations or volunteers existed.

21

Muslim population was less than 1% of the general prison population.  If the few Muslim prisoners got an in-person class, all the other 33 religious groups would expect and perhaps be owed the same, and the Program Director worried about the jail's subsequent ability to handle the administrative burden.  That suggestion is troubling.  It sounds like "the classic rejoinder of bureaucrats throughout history:  If I make an exception for you, I'll have to make one for everybody, so no exceptions."  *Gonzales v. O Centro Espirita Beneficente Uniao do Vegetal*, 546 U.S. 418, 436 (2006).

While troubling, this statement does not make out a genuine issue of fact on any issue material to the outcome of this case.  The statement is pure counterfactual.  The Program Director said it probably wouldn't be in the jail's interest to pursue a particular solution to a problem *that had never come up*.  The statement was not describing any existing policy or practice.  And it cannot seriously be read as evidence of animus during Firewalker-Fields's 83 days at Middle River, *cf. Masterpiece Cakeshop, Ltd. v. Colo. C.R. Comm'n*, 138 S. Ct. 1719, 1729–31 (2018), or as evidence that there was an off-the-books, de-facto policy to deny minority-religions certain benefits.  In the world where that stray, counterfactual comment was instead an actual contemporaneous policy, we would have to run that rule through the analysis above.  As it is, the statement does not change the outcome here.

Firewalker-Fields cannot make out a Free Exercise violation on this record, and the district court was right to grant summary judgment to Middle River on this claim.

22

### B.      Establishment Clause

"Congress shall make no law respecting an establishment of religion."  U.S. Const. amend. I.  That sentence may seem simple enough, but to put it bluntly, Establishment Clause jurisprudence has been "in shambles" for a long time.  *See Utah Highway Patrol Ass'n v. Am. Atheists, Inc.*, 565 U.S. 994, 994 (2011) (Thomas, J., dissenting from denial of certiorari).  Our Circuit has called the area "often-dreaded and certainly murky." *Koenick v. Felton*, 190 F.3d 259, 263 (4th Cir. 1999).  But a recent Supreme Court decision has provided some clarity.  Given this development, we will send the Establishment Clause claim back to the district court to take the first pass at addressing the new framework.

The Fourth Circuit has long used the three-pronged *Lemon* test, taken from *Lemon v. Kurtzman*, 403 U.S. 602, 612–13 (1971), as a one-size-fits-all Establishment Clause test. *See Wood v. Arnold*, 915 F.3d 308, 313–14 (4th Cir. 2019).  But no more.  In *Kennedy v. Bremerton School District*, 142 S. Ct. 2507 (2022), the Supreme Court upended that approach.  In discussing a school district's interests in avoiding Establishment Clause violations, the Court said that *Lemon* and its offshoots had been "long ago abandoned." *Id.* at 2427 (2022) (citing *Am. Legion v. Am. Humanists Ass'n*, 139 S. Ct. 2067, 2080–81 (2019) and *Town of Greece v. Galloway*, 572 U.S. 565, 575–77 (2014)).[5]

With *Lemon* finally dead, the question is what comes next.  *Kennedy* gives the answer:  "In place of *Lemon* and the endorsement test, this Court has instructed that the

---

[5] The Court in *Kennedy* did not explicitly say that it was overruling *Lemon*.  And the cases that it claimed had previously "abandoned" *Lemon*—*Town of Greece* and *American Legion*—did not explicitly say this either.  But it is now clear that *Lemon* and its ilk are not good law.

Establishment Clause must be interpreted by 'reference to historical practices and understandings.'" *Kennedy*, 142 S. Ct. at 2428 (quoting *Town of Greece*, 572 U.S. at 576). From now on, historical practice and understanding "must" play a central role in teasing out what counts as an establishment of religion.

But what does that historical analysis look like? *Kennedy* itself provides some guidance. The Court cited a group of other cases that have dealt with the Establishment Clause in historical terms, and suggested that their approach should inform Establishment Clause analyses going forward. *See Kennedy*, 142 S. Ct. at 2428 (citing *Town of Greece*, 572 U.S. at 577 (legislative prayer); *Am. Legion*, 139 S. Ct. at 2087 (religious monuments); *Torcaso v. Watkins*, 367 U.S. 488, 490 (1961) (religious oaths); *McGowan v. Maryland*, 366 U.S. 420, 437–440 (1961) (Sunday closing laws); *Walz v. Tax Comm'n*, 397 U.S. 664, 680 (1970) (tax exemptions)).[6]

In supplemental briefing, Firewalker-Fields marshals an array of historical sources to meet his burden under *Kennedy* to establish an Establishment Clause violation. *See*

---

[6] Take *Town of Greece* as an example. The Court began by defining a category of activity that was historically understood as acceptable under Establishment Clause principles: "legislative prayer." 572 U.S. at 575–77. Then the Court moved on "to determine whether the prayer practice in the town of Greece fits within the tradition long followed in Congress and the state legislatures," by resolving arguments about whether the challenged practice fell outside the tradition or fit within that tradition. *Id.* at 577; *see also Walz*, 397 U.S. at 680. Identify the relevant tradition, then determine whether the challenged practice is in or out.

Suppl. Appellant Br. at 4–6. [7]  But many questions remain.[8]  So we decline the invitation

to be a court of "first view" and not "a court of review."  *Lovelace v. Lee*, 472 F.3d 174,

203 (4th Cir. 2006).  The district court should have the initial responsibility of working

through Firewalker-Fields's Establishment Clause challenge under *Kennedy*.

### C.    *Pledger v. Lynch* and Rule 56(d)

One final argument must be addressed.  Beyond his substantive disagreements,

Firewalker-Fields argues that summary judgment was procedurally inappropriate under

*Pledger v. Lynch*, 5 F.4th 511 (4th Cir. 2021), because Firewalker-Fields was a pro se

plaintiff and was not given a meaningful opportunity for discovery.  In *Pledger*, this Court

---

[7] *Kennedy* makes clear that, under the Establishment Clause, historical analysis is "the rule rather than some exception."  142 S. Ct. at 2428 (cleaned up).  *See also Town of Greece*, 572 U.S. at 575–77.  So, in Establishment Clause cases, the plaintiff has the burden of proving a set of facts that would have historically been understood as an establishment of religion.  That requires proving both a set of facts, like in all litigation, and proving that those facts align with a historically disfavored establishmentarian practice.  *See Bruen*, 142 S. Ct. at 2130 n.6.  This is in contrast to those constitutional provisions where the Supreme Court has directed that historical tradition defines an exception, rather than the rule.  *See id.* at 2134–35.  There, the burden falls on the defendant to establish the exception.  *See id.* at 2127.

[8] Open questions abound.  What kinds of evidence are relevant?  *See, e.g.*, *McGowan*, 366 U.S. at 431–443; *see also Am. Legion*, 139 S. Ct. at 2085.  What kinds of evidence are the most useful?  *Marsh*, 463 U.S. at 787–88; *Walz*, 397 U.S. at 677.  Which periods of history are relevant—the era of the Bill of Rights, 1791, or the era of the incorporation of the Bill of Rights, 1868—and which period is most important?  *Compare Bruen*, 142 S. Ct. 2137–38, *with id.* at 2162–63 (Barrett, J., concurring); *see also Espinoza v. Montana Dep't of Revenue*, 140 S.Ct. 2246, 2259 (2020).  This last question might matter a great deal in the Establishment Clause context given the evidence that the understanding of that principle changed significantly between 1791 and 1868.  *See* Kurt T. Lash, *The Second Adoption of the Establishment Clause*, 27 Ariz. St. L.J. 1085, 1153–54 (1995); Steven G. Calabresi & Sarah E. Agudo, *Individual Rights under State Constitutions When the Fourteenth Amendment Was Ratified in 1868*, 87 Tex. L. Rev. 7, 32 (2008).  We could go on.

held that it was an abuse of discretion to grant summary judgment to a defendant when the plaintiff could not "present facts essential to justify his opposition" because he had not been given a reasonable opportunity to gather those essential facts. *Id.* at 526 (cleaned up) (quoting Fed. R. Civ. P. 56(d)). Rule 56(d) relief should be liberally granted, particularly when a pro se plaintiff seeks evidence that is "exclusively in the control of the opposing party." *Id.* The *Pledger* court held that it is appropriate to excuse "technical noncompliance" with Rule 56(d), especially with pro se plaintiffs where the district court is put on "fair notice of a potential dispute as to the sufficiency of the summary judgment record." *Id.* at 526.

Here, the district court did deny a motion to take depositions and then granted summary judgment against Firewalker-Fields anyway, but this is not a situation where broad Rule 56(d) relief would have been appropriate. Firewalker-Fields asked to depose several witnesses "to establish Plaintiff's sincerity of beliefs, and to provide expert testimony as to the requirement of Friday Congressional Prayer." *Firewalker-Fields v. Lee*, No. 7:17-cv-00400-NKM-JCH, Mot. to Take Deps. 1, ECF No. 69 (W.D. Va. Aug. 29, 2019). The district court properly considered the possibility of treating this as a Rule 56(d) motion. J.A. 73. While the district court noted that this request for discovery was both untimely and failed to meet the technical requirements of Rule 56(d),[9] the district

---

[9] *Pledger* also involved a court's failure to provide the plaintiff appropriate notices as required by *Roseboro v. Garrison*, 528 F.3d 309 (4th Cir. 1975). *Pledger*, 5 F.4th at 525. That is not true here. The district court gave two clear *Roseboro* notices to Firewalker-Fields. *Firewalker-Fields v. Lee*, No. 7:17-cv-00400-NKM-JCH, Roseboro Notice, ECF No. 36 (W.D. Va. Dec. 19, 2017); *Firewalker-Fields v. Lee*, No. 7:17-cv- (Continued)

court's primary reason for denying the motion was that the subject of the discovery requests would have been irrelevant to the reasons for summary judgment.  J.A. 73–74.

The requested depositions would have focused on the sincere religious belief and substantial burden pieces of Firewalker-Fields's Free Exercise claim.[10]  But the district court agreed with Firewalker-Fields on the substantial-burden issue and declined to decide the sincerity issue, instead holding for Middle River on the *Turner* analysis that we have affirmed above.  Firewalker-Fields's failure to carry his burden under *Turner* would not have changed with his requested discovery.  Evidence that Firewalker-Fields proposed easy and obvious alternative policies was not "exclusively in the control of the opposing party," *Pledger*, 5 F.4th at 526, because Firewalker-Fields could have simply submitted an affidavit saying he made such proposals (if he really had).  As for the Establishment Clause claim, Firewalker-Fields never put the court on notice that there was any possible dispute about the sufficiency of the evidence for that claim.  Because discovery would not have aided in developing essential facts, *Pledger* does not change the outcome here.

*          *          *

Middle River's policies do not violate the Free Exercise Clause.  Each of the rules and regulations that combined to keep Firewalker-Fields from engaging in communal

---

00400-NKM-JCH, Roseboro Notice, ECF No. 58 (W.D. Va. Dec. 12, 2018).  The later of those two notices informed Firewalker-Fields that counter-affidavits or additional evidence needed to be submitted within 21 days.  Firewalker-Fields submitted his motion for depositions more than eight months later in August 2019.  *Firewalker-Fields v. Lee*, No. 7:17-cv-00400-NKM-JCH, Mot. to Take Deps., ECF No. 69 (W.D. Va. Aug. 29, 2019).

[10] There is no reason to consider *Pledger*'s impact on the remanded Establishment Clause claim.

Friday Prayer during his brief stay was reasonably related to a legitimate penological interest and therefore acceptable under *Turner*.  Whether the challenged practices violate the Establishment Clause is a question best left to the district court to resolve in the first instance, with the benefit of intervening legal developments.  So the district court is

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED.*